## A02A1600. THE STATE v. WILSON.
(570 SE2d 409)

BLACKBURN, Chief Judge.

The State appeals the trial court's grant of defendant Kit Wilson's motion to suppress his statements in his criminal prosecution on felony charges of aggravated child molestation, child molestation, and cruelty to children — first degree, and on a misdemeanor charge of sexual battery. The State contends that the trial court erred in (1) concluding that because Wilson was in custody at the time of his interrogation, he should have been advised of his *Miranda* rights and (2) finding that Wilson's statement was not voluntary because he was interrogated for approximately three hours after twice inquiring about the necessity of counsel, and being advised by the police that he did not need counsel. We affirm.

> An appellate court reviewing a trial court's order on a motion to suppress evidence must accept the trial court's decisions with regard to questions of fact and credibility unless they are clearly erroneous. The reviewing court must also construe the evidence most favorable to the upholding of the trial court's findings and judgment and must not disturb the findings of the trial judge unless no evidence exists to support them.

*Barraco v. State.*[1]

In its excellent order granting Wilson's motion to suppress on November 9, 2001, the trial court held inter alia:

> On November 8, 2001, this Court held a *Jackson-Denno* hearing on the Defendant's Motion for Exclusion of Involuntary Admissions and Confessions. In his Motion, the Defendant sought to suppress and exclude from evidence any comments or purported confessions that . . . he made at the time of his arrest for child molestation. During this hearing, the Court listened to several witnesses and received various other items of evidence, including the tapes and transcript from the Defendant's meeting with police. After giving due consideration to the evidence submitted by both parties, and after considering the relevant case law, this Court hereby grants Defendant's Motion. In so doing, the Court finds as follows:
> The testimony presented to this Court revealed the following. On June 1, 2001, police officers from the City of

---

[1] *Barraco v. State*, 244 Ga. App. 849 (537 SE2d 114) (2000).

Monroe phoned the Defendant at home, and requested a meeting with him. They told him that they would be sending an officer to his house to pick him up and bring him to the police station. Defendant waited for the police, but no one came to his house. He then decided to travel to the police station on his own. Daniel Moon, his half-brother, and another man drove him to the police station.

At the station, the Defendant was met by Officers Jack Vickery and Tony Lafreniere. When questioned by the Court, Vickery admitted that the Defendant was in fact their prime suspect at that time. According to the testimony of Moon, the Defendant, upon arrival, asked whether he was in any trouble, and whether he needed to get an attorney. Moon stated that the Defendant was told by the police that they merely had some routine questions, and that he did not need an attorney. Officer Vickery testified on direct examination that the Defendant never inquired as to whether he needed an attorney. However, when called on by the prosecution to rebut the testimony of Moon, Officer Vickery acknowledged the possibility that the Defendant might have asked him whether he needed counsel.

From the police station, the Defendant and the two officers proceeded to the Department of Family and Children Services ("DFACS"), where they met with DFACS employee Penny Shirley. Again, the Defendant was driven by his half-brother and another man. Moon testified that he and the other man were told by the officers that they could not enter the building.

With Shirley present, the police began speaking with the Defendant around 7:30 p.m. The conversation was tape recorded. The Defendant, whose employment requires him to work the "late" shift, informed the officers that he had been up since 3:00 a.m., that he had just been released from the hospital a few days earlier after a bout of pneumonia, and that he had not eaten anything the entire day. The officers and Shirley proceeded to question him for nearly three hours. At some point after two hours of questioning, the tape recording ended. According to Officer Vickery, a span of approximately 10 to 15 minutes elapsed between the time that the tape ended and the time that a new tape began. The last tape was the third tape used by the police during their meeting. Although the officers allowed the second tape to just run out, the transcript showed that, between the first and second tape, the officers were cognizant of when the tape would end and stopped the interview

to change the tape. Almost immediately after the third tape recording began, the Defendant made various statements that the prosecution contends are confessions and/or admissions. At that point, the Defendant had been awake for over 18 hours. Questions continued for several more minutes after this point. The police admitted that at no point prior to or during this meeting did they advise the Defendant of his *Miranda* rights.

The transcript from that meeting was offered into evidence by the State. This transcript reveals that the Defendant was aware that the reason the police wanted to talk with him was because of bruises he had left on the buttox [sic] of the alleged victim. See *Transcript from Meeting with Kip Wilson* on June 1, 2001, (hereinafter "Meeting") at p. 4-5, 21. The Defendant was aware that the victim's physician had told the victim's mother that he had called DFACS because of those bruises, and advised her to fill out a police report. See *Id.* at p. 5. The police informed him that there was "a problem" when there was "substantial bruising like she had." *Id.* at p. 6. The Defendant stated that the child's mother was "highly upset" with him and questioned him about whether he had spanked her. *Id.* at p. 5-8. Early in the interview, Officer Vickery directly questioned him about whether he was responsible for the injuries to the child. See *Id.* at p. 12.

Later in the interview, Officer Lafreniere informed the Defendant that he was "not gonna sugarcoat this anymore. . . . I'm not gonna make this sound like it's . . . we know (inaudible). We know the reason why we are here is pretty serious." *Id.* at p. 20. He proceeded on to say that "I will say that the bruises are substantial on . . . on that young girl. Okay and criminal charges can be filed on you. Okay for child abuse. It's a felony in the State of Georgia. Okay. Have you ever been in trouble with the law before?" *Id.* The Defendant told the officers that he was pretty upset when he told his friends about why they needed to give him a ride to the police station. See *Id.* at p. 21. When asked by the officers whether they knew why he was there, the Defendant stated that he told his friends "the part about the bruises and where they were." Officer Lafreniere then asked, "did you tell him about the part about the penetration of the anus?" *Id.* at p. 21.

Officer Vickery went on to tell the Defendant that he was: "trying to get to the truth. But we [are] also trying to get the person that did this the opportunity to help them

lose some of that weight. Take off some of that pressure. . . . Yeah this person admits that he's wrong. Yeah, this person's responsible enough to come forward and take responsibility for it and wants to come forward and take responsibility for it and wants to come forward and get what help he can in order to help him get back on the right track." Id. at p. 31.

Near the end of this three hours interview, the police informed the Defendant that he was going to be charged with this crime. See Id. at p. 41. Although the police spoke at length with the Defendant after this point, they still did not inform him of his *Miranda* rights. The following exchange with the Defendant, which occurred after they had informed him he would be charged with a crime, was perhaps as close as they came to doing so:

Wilson: How long do you think it will take?
Lafreniere: What?
Wilson: Just to go to court.
Lafreniere: I would say a couple of months.
Vickery: Before it goes to court.
Lafreniere: You'll get a letter in the mail.
Wilson: Mm-hmm.
Lafreniere: Okay. That's a couple of weeks. We're pretty good about that. Uh . . . your letter will state something to effect if you want an um . . . attorney, this that and the other thing, then people have their rights. You have the right to an attorney. If you can't afford an attorney, one will be appointed for you free of charge. It's true. But not everybody . . . qual . . . (clears throat) for an attorney.
Vickery: You have to. . . .
Lafreniere: Depending on how much income. (Inaudible.) You don't qualify for an attorney, if you want one. (Inaudible.)
Vickery: We don't know your financial situation. We are not the ones who are here to determine if you can afford an attorney.

Id. at p. 45.

The prosecution contends that the Defendant was not in a custodial setting when he spoke with the police, and that the Defendant's statements were entirely voluntary. This Court, quite simply, cannot agree. Regarding custodial interrogations, the Georgia Court of Appeals has stated: Under *Miranda*, persons must be advised of their rights against self-incrimination after being taken into custody or

otherwise deprived of their freedom of action in any significant way. *Reinhardt v. State*.[2] In distinguishing between custodial and non-custodial interrogation, several factors may be utilized. *State v. Hendrix*.[3] These include: probable cause to arrest, subjective intent of the police, subjective belief of the defendant, and the focus of the investigation. Id. *Hadley v. State*.[4]

"All of these factors are significant elements to be weighed in determining the 'custody' issue." [(Punctuation omitted.) *Hendrix*, supra.]

In analyzing the facts of this case to these factors, it appears clear to this Court that the meeting between the police and the Defendant was a custodial interrogation. The police would have had probable cause to arrest the Defendant after the mother filed a police report alleging child abuse against the Defendant. The police admitted in the hearing that the Defendant was the focus of their investigation, saying in fact that he was their prime suspect at that time. While it is true that "whether a police officer focused his *unarticulated* suspicions upon the individual being questioned is of no consequence for *Miranda* purposes," *Hodges v. State*[5] (emphasis added), the meeting transcript shows that the officers clearly conveyed their suspicions about the Defendant to him. The Defendant's testimony demonstrates his awareness that he was being interviewed because the police believed he had done something wrong. The interview took place, at the request of the police, away from the Defendant's home at DFACS, and went on for nearly three hours. Accordingly, this Court finds that the Defendant was deprived of his freedom in a significant way.

Moreover, this Court finds that the Defendant's statements to the police were not voluntary. Regarding whether a statement is voluntary, the Georgia Supreme Court has said: Whether a waiver of rights and a subsequent statement have been voluntary and knowing depends upon the totality of the circumstances. The totality of the circumstances is determined through a consideration of nine factors: (1) age of the accused; (2) education of the accused; (3) knowledge of the accused as to both the substance of the charge and the nature of his right to consult an attorney and

---

[2] *Reinhardt v. State*, 263 Ga. 113, 114 (3) (a) (428 SE2d 333) (1993).
[3] *State v. Hendrix*, 221 Ga. App. 331, 333 (1) (471 SE2d 277) (1996).
[4] *Hadley v. State*, 235 Ga. App. 737, 738 (510 SE2d 569) (1998).
[5] *Hodges v. State*, 265 Ga. 870, 872 (2) (463 SE2d 16) (1995).

remain silent; (4) whether the accused is held incommunicado or allowed to consult with relatives, friends, or an attorney; (5) whether the accused was interrogated before or after formal charges [had been] filed; (6) methods used in interrogation; (7) length of interrogation; (8) whether or not the accused refused to voluntarily give statements on prior occasions; and (9) whether the accused has repudiated an extrajudicial statement at a later date. (Citations omitted.) [*Reinhardt*, supra at 115 (3) (b).] The burden is on the prosecution to show the voluntariness of a custodial statement by a preponderance of the evidence. Factual and credibility determinations of this sort made by a trial judge after a voluntariness hearing must be accepted by appellate courts unless such determinations are clearly erroneous. *Kunis v. State*.[6]

There was no evidence presented at trial to show that the Defendant knew he had a right to consult an attorney or remain silent prior to the meeting. Indeed, the testimony of the Defendant's half-brother, which this Court deemed credible, showed that the Defendant inquired about whether he needed an attorney and was specifically told that he did not. The Plaintiff's half-brother was told that he was not allowed to enter the building with his brother. Despite knowing that the Defendant had been up since 3:00 a.m., was recovering from pneumonia, and had not eaten that day, two police officers and a DFACS worker peppered their prime suspect with questions for nearly three hours, never once informing him of his *Miranda* rights.

Even more disturbing to this Court was how the police conveniently forgot to put a new tape in just before the Defendant made the allegedly incriminating statements. There was no evidence presented to show what occurred during that lapse in recording, how long the lapse was, nor was it memorialized (i.e. police notes etc.) in any way. Although Officer Vickery testified that it lasted only 10 to 15 minutes, that is not confirmed on the transcript. Even if it was only that long, 10 to 15 minutes is quite a long time to speak with your prime suspect, especially in view of the fact that he immediately thereafter "confessed." Moreover, Vickery initially testified that the Defendant never asked for an attorney, but later acknowledged the possibility that the

---

[6] *Kunis v. State*, 238 Ga. App. 323 (518 SE2d 725) (1999).

Defendant had inquired about counsel. Accordingly, the credibility of this entire interrogation was greatly damaged.

1. The State argues that Wilson was not entitled to be advised of his *Miranda* rights because he was not in custody during the interview, and, therefore, the trial court erred in suppressing Wilson's admission. "Under *Miranda*, persons must be advised of their rights with respect to interrogation after being taken into custody or otherwise deprived of their freedom of action in any significant way." *Reinhardt*, supra at 114 (3) (a). In *Stansbury v. California*,[7] the United States Supreme Court stated that the basis for the court's imposition of the *Miranda* requirements was the compulsive aspect of custodial interrogation. It further stated that to determine whether an individual was in custody, the court must examine all the objective circumstances surrounding the interrogation. Id. In this case, the trial court found that the meeting between Wilson and the police was a custodial interrogation because Wilson was deprived of his freedom in a significant manner. In its analysis of the facts, the trial court relied upon the four factors which we outlined in *Hendrix*, supra, for distinguishing between custodial and noncustodial interrogation. See also *Hadley*, supra. The four factors are (1) probable cause to arrest, (2) the subjective intent of the police, (3) the subjective belief of the defendant, and (4) the focus of the investigation.

Using these four factors to assess this case, the trial court found that the police had probable cause to arrest prior to Wilson's interrogation based upon the mother's report to police alleging child abuse. Secondly, the subjective intent of the police was demonstrated by the fact that the officers admitted that Wilson was their prime suspect and they had conveyed their suspicions to Wilson. See *Stansbury v. California*, supra at 325 (II) ("[a]n officer's knowledge or beliefs may bear upon the custody issue if they are conveyed by word or deed, to the individual being questioned"). As to the third and fourth factors, the trial court determined that Wilson's testimony showed that he was aware that the police believed he had done something wrong and was the focus of the police investigation.

Moreover, the trial court found that the interview took place at the request of police, away from the defendant's home, and went on for nearly three hours during which Wilson did not leave the interrogation room. His half-brother and a friend, who accompanied Wilson to the interview, were not allowed in the building where the interview was conducted, but were required to wait in the parking lot.

At no time did the officers inform Wilson of his *Miranda* rights

---

[7] *Stansbury v. California*, 511 U. S. 318, 323 (114 SC 1526, 128 LE2d 293) (1994).

even after they told him he was going to be charged. The trial court's order reflects his doubt as to the credibility of the police officers for the reasons stated therein. A review of the subject order shows that the trial court followed a proper analysis, and the record supports his factual findings. Therefore, we find no error in the trial court's holding that Wilson was in custody during his interrogation, that he should have been advised of his *Miranda* rights, and that his statements were not voluntary and were thus suppressed. *Turner v. State.*[8]

2. The State also contends that the trial court erred in finding that Wilson's statement was not voluntary. For the reasons stated in Division 1, we find no error in the trial court's holding that Wilson's statement was not voluntary and was thus inadmissible.

*Judgment affirmed. Johnson, P. J., and Miller, J., concur.*

DECIDED AUGUST 21, 2002.

*W. Kendall Wynne, Jr., District Attorney, Marcy H. Gonzalez, Assistant District Attorney*, for appellant.
*David J. Farnham*, for appellee.

---

[8] *Turner v. State*, 233 Ga. App. 413, 414 (1) (a) (504 SE2d 229) (1998).