A04A0338. LOPEZ v. THE STATE.
A04A0339. MEJIA v. THE STATE.
(601 SE2d 116)

MILLER, Judge.

In a joint jury trial, Ubence Lopez a/k/a Ramon Maisoney Rodriguez and Francisco Mejia were both convicted of trafficking in cocaine. After filing unsuccessful motions for a new trial, Lopez and Mejia filed separate appeals, raising several distinct grounds. After extensive review, we discern no error and affirm.

Viewed in the light most favorable to the verdict, the evidence shows that on April 24, 2001, an undercover Drug Enforcement Administration (DEA) agent met with Mario Martinez and Jose "Lupe" Garza at a shopping center to finalize the purchase of one kilogram of cocaine. The agent posed as the buyer. Also present during these negotiations was a confidential informant (CI) who had previously introduced the agent to Martinez and Garza and served as intermediary on a prior drug deal involving the same participants. Concerned that he might get cheated, Martinez asked the agent whether his money was real or counterfeit. When the agent asked Martinez to show him the cocaine, Martinez told him that the cocaine was "nearby" and "very close" and asked the agent to accompany him to pick it up. When the agent refused to do so, Martinez left in a blue Chevrolet Celebrity. Garza, the CI, and the agent remained behind at the shopping center to await Martinez's return.

While other law enforcement officers maintained surveillance, Martinez proceeded directly to the parking lot of an apartment complex located less than a mile away. As another DEA agent watched, a red pickup truck driven by Mejia backed into a parking space, and Martinez pulled into an adjacent space. This agent testified that when "the blue Celebrity c[a]me through, the red pickup

truck stops, backs up, and the blue Celebrity pulls in right next to it." Lopez was the passenger in Mejia's truck. By positioning their vehicles next to one another, Martinez and Mejia could speak to each other without exiting their vehicles. The drivers met briefly before leaving in tandem, but the observing agent did not see whether anything had been exchanged. Martinez, Lopez, and Mejia left the apartment complex and went to the shopping center where the CI and the others were waiting.

From the time that Martinez left the shopping center and came back with the cocaine, no more than ten or fifteen minutes had passed. Surveillance officers at the shopping center watched Mejia's red pickup truck follow Martinez's vehicle until Mejia parked his truck about 35 yards away from the location of the anticipated drug deal. Mejia parked his truck facing toward Martinez's car.

After returning to the shopping center, Martinez showed the cocaine to the undercover agent. While also standing next to Martinez's car, Garza began demanding, "[w]here's the money?" The agent told them he was going to get the money and began walking toward his vehicle. As the agent walked toward his vehicle, he gave a "takedown" signal to his fellow officers. At this signal, agents moved in to arrest Martinez and Garza. To avoid apprehension, Martinez then slammed his vehicle into reverse and backed into one of the agents' vehicles. Although Garza fled on foot, agents captured him at the scene.

Other officers immediately intercepted Lopez and Mejia before they could leave. At the time of his arrest, Mejia was using his cell phone.

Searches of the four men revealed substantial amounts of money. Martinez had $865, Lopez had $335, Mejia had $1,166, and Garza had $114. Agents removed the package of suspected cocaine from Martinez's car. A Georgia Bureau of Investigation forensic chemist later analyzed the contents of the package and determined that the substance inside was, in fact, cocaine. The chemist testified that the drugs weighed 2.1 pounds or about 900 grams and had a purity of 47 percent cocaine.

The undercover agent testified that with the help of the CI, he had met with Martinez and Garza in early February at the same shopping center and bought an ounce of cocaine from them for $1,000. After that buy, the agent and the CI had several telephone conversations with Martinez and Garza, some of which were recorded. The agent testified that he, Martinez, and Garza had tried three or four times to set up the kilogram deal. When asked, "[d]id [Martinez] or [Garza] ever indicate to you why they weren't ready on the previous occasions?" the agent testified that they had told him that "they didn't have the kilogram of cocaine I was looking for." The agent attributed

the delay in finalizing the transaction to the explanation provided by Martinez and Garza that "they were out and had not received any more."

Agents recovered cellular telephones from each of the four men. An agent reviewed the contents of the cell phones and discovered that Lopez had stored in his cell phone the cell phone numbers of co-defendants Mejia, Martinez, and Garza. The cell phones belonging to Martinez and Garza both had Lopez's number stored in them. Martinez's phone showed received calls from Lopez.

Martinez and Garza entered negotiated guilty pleas to trafficking in cocaine and possession of hydrocodone.[1] In exchange for their guilty pleas and their agreements to testify truthfully in this case, the State recommended that Martinez and Garza pay $300,000 fines and serve 30-year sentences with the first 15 years in confinement.

At trial Martinez testified that after the undercover agent asked him to get a kilogram of cocaine for him, he called Lopez. Martinez testified that "I had talked with him many times, but they had not been able to gather all of the drugs" until that day. Martinez testified that through Lopez he met Mejia but did not have Mejia's phone number, and that he could only contact Mejia through Lopez. According to Martinez, when he called Lopez an hour or two before the deal on April 24, Lopez had told him on the phone that "they were on their way to my house and that they had the drug[s]." Martinez also testified that Lopez provided him with a pen so that "we could tell that the money was not counterfeit." Martinez testified that Mejia said that "he wanted $20,000 and anything left over we could keep." Martinez testified that when he first saw the cocaine it was in Lopez's hands, but then told Lopez to pass the drugs to Martinez, which Lopez did. Martinez also testified that it was Mejia who "told me, for me to take it and he would follow behind." He stated that Lopez also said they were going to follow him.

Garza testified that he contacted Lopez to get the kilogram and that a week earlier Lopez had told him that he had a friend who had that amount. Garza testified that earlier on April 24, he and Martinez had met with Lopez and Mejia at the apartment complex where Garza lived with Martinez. Garza testified that "they told us that they had the drug to be able to deliver." When asked who said that the cocaine was ready to deliver, Garza responded, "Francisco Mejia." Garza also testified that Lopez gave Martinez a pen "so that we could check the bills." He testified that as part of the deal, "[w]e had to turn over $20,000 to Mejia."

A jury found Lopez and Mejia guilty of trafficking in cocaine.

---

[1] As to the trafficking count, the State reduced the quantity of cocaine involved.

## Case No. A04A0338

Prior to trial, Lopez filed a motion to suppress, arguing that he was arrested and seized without probable cause and that evidence obtained as a result of the illegal seizure of his cell phone should be excluded.[2] Lopez also filed a motion to reveal the identity of the CI. These motions were denied.

1. Lopez contends that the trial court erred in admitting what he characterizes as "profile evidence." He claims that the trial court erred in allowing the undercover agent to testify about his past experience as a drug agent in arranging purchases of large amounts of cocaine.

At the pre-trial motion hearing, Lopez agreed to stipulate that the undercover agent was an expert in "the undercover investigation of large-scale narcotics trafficking." At trial the agent was not formally tendered as an expert. Nevertheless, "[a] witness may become qualified to render an expert opinion without ever being formally so declared by the court." (Footnote omitted.) *Mitchell v. State*, 242 Ga. App. 694, 695 (3) (531 SE2d 143) (2000).

Contrary to Lopez's argument, at no point did the agent testify that Lopez fit the profile of a drug supplier or that Lopez shared characteristics common to such individuals. His testimony about large-scale trafficking in narcotics was "beyond the ken" of the average juror, and was relevant to the facts of the case to describe the sequence of events that took place between late January and the latter part of April. See *Vaughan v. State*, 251 Ga. App. 221, 223 (1) (b) (553 SE2d 335) (2001). There was no error. See *Mitchell*, supra, 242 Ga. App. at 696 (3).

2. Lopez asserts that the trial court erred in admitting evidence of the $1,000 February drug deal as a similar transaction. However, before trial the State withdrew its intent to introduce the February drug deal as similar transaction evidence, announcing its decision not to present that evidence. Despite the State's announcement that it would not present the similar transaction evidence, counsel for both Lopez and Mejia argued at the pre-trial motion hearing that the evidence of the prior one-ounce sale was so interrelated with the one-kilogram sale that their absence from that deal should be admissible to indicate their lack of involvement in the larger sale. Ironically, the State objected to the use of this evidence against Martinez and Garza as improper character evidence. Ultimately, the trial court allowed the evidence.

---

[2] Mejia joined the motion as to the improper search of his cell phone and the legality of his arrest.

As part of trial strategy, Lopez elected to introduce evidence of his noninvolvement in the February sale. By eliciting testimony to show that he did not participate in the February drug deal, Lopez induced any error relating to the admission of Martinez's testimony that identified Lopez and Mejia as the suppliers of the ounce of cocaine sold in the February transaction. Therefore, Lopez cannot now complain on appeal about the deleterious results stemming from his own trial strategy. See *Crowe v. State*, 193 Ga. App. 385, 386 (388 SE2d 24) (1989).

3. Lopez asserts that the trial court erred by not giving limiting instructions on the purpose of the similar transaction evidence. The failure to give a limiting instruction is not error in the absence of a request for one. *State v. Belt*, 269 Ga. 763, 764 (505 SE2d 1) (1998). Here, no request was made, and therefore no error occurred.

4. Lopez contends that the trial court erred by not requiring the State to reveal the identity of its CI. We disagree.

As a matter of public policy, Georgia favors the nondisclosure of an informant's identity. *Turner v. State*, 247 Ga. App. 775, 777 (2) (544 SE2d 765) (2001).

> In determining if the informant's identity should be revealed by the state, the trial court must conduct a two-step hearing. Initially, the trial court should hear evidence to determine: (a) that the confidential informant is an alleged informer-witness or informer-participant whose testimony appears to be material to the defense on the issue of guilt or punishment; (b) that the testimony for the prosecution and the defense is or will be in conflict; and (c) that the confidential informant was the only available witness who could amplify or contradict the testimony of these witnesses. The defendant must establish the relevance and materiality of the testimony and the necessity of disclosing the identity of the informant. Once this threshold has been met, the trial court must conduct an in camera hearing of the informant's testimony and balance the public interest in protecting the flow of information against the defendant's right to prepare his defense.

(Footnotes omitted.) Id.

Here, the court conducted an in camera hearing on the issue of disclosing the CI's identity. After listening to the CI's testimony and considering testimony from two other hearings, the trial court found that the CI's testimony "is not exculpatory to any of the defendants and is not material to any evidence insofar as the defense of any of the cases." The court further found that, "[a]nd also taking into consideration the balancing test with respect to the rights of each of the

defendants individually with respect to the rights of the State, it will be the finding of the Court that that would not require disclosure of the confidential informant's identity to any of the defendants."

Lopez disputes these findings, contending that the CI was the only person who could testify that he was not the supplier. Yet, during the in camera hearing, the CI never said that he knew the identity of the supplier. The CI testified that he had negotiated only with Martinez and Garza and testified that he did not talk to or meet anyone else. At trial the undercover agent provided substantially the same information and testified that the CI never told him that Lopez or Mejia were drug dealers. The agent also testified that neither he nor the CI ever spoke with Lopez or Mejia. He also conceded that the CI had never mentioned Lopez by name. In these circumstances, Lopez failed to show that the trial court erred in finding that the disclosure of the CI's identity was not warranted.

5. Lopez claims that the trial court erred by denying his motion to suppress, because his arrest was illegal and lacking in probable cause.

In deciding a motion to suppress evidence, the trial court sits as the trier of fact and hears the evidence. *Evans v. State*, 262 Ga. App. 712 (1) (586 SE2d 400) (2003). When the trial court considers conflicting evidence, the court's findings are analogous to a jury verdict and should not be disturbed when there is any evidence to support those findings. See id.

Here, the evidence established that Martinez told the undercover agent that he did not have the cocaine but that the cocaine was close by. Martinez went to a nearby apartment complex where Martinez met up with Lopez and Mejia. A DEA agent saw Martinez and Mejia park directly next to each other where they could talk or exchange objects without leaving their respective vehicles. Lopez and Mejia followed Martinez from the apartment complex to the shopping center where the drug deal was to occur. When Martinez returned to the shopping center, he had the package of cocaine. After Mejia parked his truck facing the area of the anticipated exchange, both Lopez and Mejia remained inside the truck, apparently to watch the drug deal. See *Cody v. State*, 222 Ga. App. 468, 470 (1) (474 SE2d 669) (1996). After construing this evidence in the light most favorable to upholding the trial court's determination (see *State v. Wilson*, 257 Ga. App. 120 (570 SE2d 409) (2002)), we cannot say that the trial court erred in finding there was probable cause to arrest Lopez and Mejia.

6. Lopez asserts that the trial court erred in failing to suppress the search of his cell phone. He points out that, unlike Mejia, at the time of his arrest, he was not using his cell phone.

When Lopez was taken into custody, he was searched incident to his arrest and his cell phone was confiscated. Evidence shows that

Lopez's cell phone was an instrumentality of the crime of cocaine trafficking. The details of the drug transaction were arranged by telephone. A DEA agent testified that he spoke with Martinez and Garza numerous times by phone who, in turn, testified that they had called Lopez. Later, as the drug transaction unraveled, police observed Mejia using a cell phone.

During a lawful search incident to an arrest, "an officer may, without a warrant, make a full search of the accused for the discovery and preservation of criminal evidence." (Citation and punctuation omitted.) *Bagwell v. State*, 214 Ga. App. 15, 16 (446 SE2d 739) (1994). While conducting a lawful search, if an officer comes upon contraband or the fruits and instrumentalities of a crime, he is entitled to seize such items as probative of criminal conduct. Id. *Bagwell* does not, however, address the search of the contents of a cell phone. Even so, the State argues that just like personal papers obtained during a search incident to arrest that contain names and phone numbers relevant to particular crimes, the cell phones obtained during a search incident to arrest in this case contained information relevant to the crime of drug trafficking.

Although neither side presented any authority directly on point, the trial court carefully considered the facts and circumstances presented, and crafted a narrow ruling tailored to those specific circumstances. Cf. *Vega v. State*, 236 Ga. App. 319 (512 SE2d 65) (1999) (upholding search of closed container). Even assuming for the sake of argument only, that the admission of the information gleaned from Lopez's cell phone was error, in light of the overwhelming evidence of Lopez's guilt, any error in the admission of such evidence was harmless beyond a reasonable doubt. See *Dorsey v. State*, 273 Ga. 754, 755 (2) (546 SE2d 275) (2001).

## Case No. A04A0339

In his motion for new trial, Mejia claimed, among other things, to have learned through an inmate that Martinez, his co-defendant, had told the inmate that he intended to give false testimony against Mejia in order to obtain a lighter sentence. Mejia also claimed to have discovered "irregular jury conduct" so prejudicial that it had resulted in a verdict lacking in due process. The trial court conducted a post-trial evidentiary hearing to consider these claims and other issues.

7. Mejia asserts that he is entitled to a new trial based on newly discovered evidence. Relying upon the hearsay testimony of the inmate, Mejia claims that Martinez lied under oath to obtain a favorable deal with the State.

At the post-trial hearing, the inmate testified that while sharing a holding cell with Martinez, he told Martinez that "the DA was willing to reduce my charges from armed robbery to robbery in exchange for . . . my testimony against my co-defendant." According to the inmate, Martinez then "told me that . . . he hated to . . . do what he had to do . . . but him and his co-defendant, another friend of his, was going to put everything on Francisco [Mejia]. . . ." The inmate also testified that Martinez made the remark that "a man had to save his own ass." Mejia claims that his conviction must be reversed because it was based on perjured testimony.

Absent proof of a conviction for perjury of a material witness, a verdict cannot be set aside for perjury. *Head v. State*, 256 Ga. App. 624, 628 (2) (569 SE2d 548) (2002). "The only exception to the rule against setting aside a verdict without proof of a material witness' conviction for perjury, is where there can be no doubt of any kind that the State's witness' testimony in every material part is purest fabrication." (Citation and punctuation omitted.) *Norwood v. State*, 273 Ga. 352, 353 (2) (541 SE2d 373) (2001).

Martinez was not convicted of perjury and Mejia failed to establish that his testimony was the purest fabrication. Notwithstanding Mejia's claim to the contrary, Martinez's testimony was not the sole evidence of Mejia's guilt. Lopez corroborated Martinez's testimony that Mejia was to receive $20,000 from the deal. Other evidence showed that Martinez told the undercover agent that the cocaine was close by then drove only a short distance away from the shopping center where he met with Lopez and Mejia. When Martinez returned after meeting with Mejia, he had the package of cocaine. After Mejia's brief meeting with Martinez, Mejia followed Martinez to the shopping center, the location of the anticipated drug transaction. Mejia then parked his truck and remained inside it. In light of this evidence, we cannot say that Mejia proved that Martinez's testimony was the "purest fabrication." Accordingly, the trial court properly denied Mejia's motion for new trial on this ground.

8. Mejia claims that the trial court erred in denying his motion to suppress. He claims that the State lacked sufficient reasonable suspicion and probable cause to detain him and the trial court erred in finding otherwise. As discussed in Division 5, the record contains evidence to support the trial court's determination.

9. Mejia contends that irregular conduct on the part of the jury resulted in a verdict that violated his rights to due process. He claims that a presumption of prejudice arose from that irregularity and that the State failed to prove beyond a reasonable doubt that he was not harmed.

When an irregularity in the conduct of a juror is shown, a presumption of prejudice to the defendant arises and the burden is on

the State to prove beyond a reasonable doubt that no harm occurred. *Sims v. State*, 266 Ga. 417, 419 (3) (467 SE2d 574) (1996). "However, a jury verdict will not be upset solely because of such conduct, unless the statements are so prejudicial that the verdict must be deemed inherently lacking in due process." (Citation and punctuation omitted.) Id.

Moreover, "[w]here the trial court receives evidence that is conflicting as to irregularities in the conduct of the jury, the appellate court will not reverse unless the trial court has abused its discretion." (Citation and punctuation omitted.) *Colantuno v. State*, 262 Ga. 830, 831 (1) (426 SE2d 563) (1993). Here, the substance of the alleged remark at issue remains murky at best. Two jurors and Mejia's co-counsel testified on the issue. Neither juror could specifically recall a time that the court had admonished defense counsel. Nor does the trial transcript reflect such an incident. One juror testified that he heard that another juror had said something about the trial court "getting on [trial counsel]." This juror, however, denied hearing the statement himself. The juror testified that "I just took it for a grain of salt and didn't worry about it." However, the juror who purportedly made the remark could not recall doing so. Both jurors testified that the alleged statement and their personal feelings toward counsel did not influence their verdict. Mejia's co-counsel, who spoke with some jurors after the verdict, was unable to provide clarification. He testified that he thought that one of the jurors had said that the court admonished defense counsel during a bench conference. However, defense counsel then admitted that it was not clear to him whether the juror had meant the State or the defense attorneys.

There was no evidence that any juror was harboring a predetermined view of guilt, was deliberating prior to the close of evidence, or was attempting to persuade another juror on any issue or testimony in the case. Even assuming there was a violation of the trial court's instruction not to discuss the case, we are satisfied that the juror's actions were harmless beyond a reasonable doubt. See *Sims*, supra, 266 Ga. at 420 (3).

10. Mejia asserts that the trial court erred by denying his request to charge on the details of the agreement between the State and his co-defendants "based upon the defense that 'Mario' and 'Lupe' had colluded to give false testimony regarding the Appellant's participation in the drug transaction with [the undercover agent]." Arguing "there was no link between the Appellant and the drug transaction," he claims that no law enforcement officer observed him participate in the drug deal, thereby making the co-defendants' testimony essential to the State's case.

Among other requirements, a requested charge must be adjusted to the evidence in the case and embody a correct, applicable, and

complete statement of law. *Buckalew v. State*, 249 Ga. App. 134, 138 (5) (547 SE2d 355) (2001). Further, it is not error for a trial court to refuse a requested charge when the instruction as a whole adequately covers the one sought. *Parker v. State*, 270 Ga. 256, 258 (3) (507 SE2d 744) (1998).

Here, the court's instruction included charges on the credibility of witnesses, mere presence and mere association, impeachment, contradictory statements, and the requirement that accomplice testimony be supported by other evidence. The court explicitly instructed the jury that "[y]ou may consider whether or not the testimony from such a witness [who testified pursuant to a promise of leniency or as a result of a negotiated plea in which leniency may be inferred] might be slanted in such a way as to further the witness's own interest." Having considered the charge as a whole and the legal principles therein, we find no error. See *Mohamed v. State*, 276 Ga. 706, 710-711 (4) (583 SE2d 9) (2003).

*Judgments affirmed in Case Nos. A04A0338 and A04A0339. Andrews, P. J., and Ellington, J., concur.*

DECIDED MAY 21, 2004.

*David L. Whitman, Norman H. Cuadra*, for appellant.
*Daniel J. Porter, District Attorney, Karen M. Harris, William C. Akins, Assistant District Attorneys*, for appellee.