S07A1234. VERGARA v. THE STATE.
(657 SE2d 863)

CARLEY, Justice.

Ignacio Vergara and his co-defendant, Brigido Soto, were indicted for the murders of Alejandro Santana and Francesco Saucedo

and for related crimes, which occurred on March 13, 2002. The State gave notice of its intent to seek the death penalty. This Court granted interim review to determine whether the trial court erred in failing to suppress Vergara's March 28, 2002 custodial statement and all evidence obtained as a result thereof. Vergara has also addressed whether the trial court erred in failing to suppress statements he made to police on March 26, 2002 and in the early morning of the following day, and the evidence seized as a result of those statements.

In responding to a 911 call on March 13, 2002, police discovered the bodies of the two male victims, shot multiple times, in a parked vehicle on a road in Hall County. On March 26, 2002, Georgia Bureau of Investigation (GBI) Agent Blackwell and Investigators Evans and Spindola went to Vergara's residence in connection with their investigation of the victims' deaths. After Spindola told Vergara that his home telephone number had been found in the cellular telephone of one of the victims, Vergara accompanied the officers to the Law Enforcement Center (LEC), where he was interviewed after receiving in Spanish his rights under *Miranda v. Arizona*, 384 U. S. 436 (86 SC 1602, 16 LE2d 694) (1966), and signing a waiver form. During the videotaped interview, in which all three officers participated with Spindola acting as translator, Vergara acknowledged being present at the murders, implicated Soto as the perpetrator, and handed the officers a notebook containing Soto's telephone number.

Following this interview, while riding with Blackwell, Spindola, and Lead Investigator Couch, Vergara retraced his and Soto's movements on the day of the murders, visited the scene where the murders occurred, and aided the officers in retrieving the cellular telephone belonging to one of the victims. After returning to the LEC, Vergara made a telephone call to Soto, which the officers audiotaped. Vergara then accompanied the officers on another ride, and, after he pointed out Soto's apartment, the police took him to a nearby church to wait in the parking lot while Couch obtained a warrant for Soto's arrest. At approximately 12:45 a.m. on March 27, after Soto's arrest and interview, Vergara was again given the *Miranda* warnings and interviewed. During this interview, he disclosed the location of the handgun allegedly used to commit the murders, and he accompanied the officers as they retrieved it. At 1:55 a.m., after reminding Vergara of his *Miranda* rights, the police resumed the interview. Couch obtained a warrant for Vergara's arrest at 3:40 that morning. Vergara was re-interviewed on March 28, 2002.

The trial court determines the admissibility of a defendant's statement under the preponderance of the evidence standard considering the totality of the circumstances. *Fowler v. State*, 246 Ga. 256, 258 (3) (271 SE2d 168) (1980).

The issue presents a mixed question of fact and law. [Cit.] On appeal, we accept the trial court's findings on disputed facts and credibility of witnesses unless clearly erroneous, but independently apply the legal principles to the facts. [Cit.]

*Linares v. State*, 266 Ga. 812, 813 (2) (471 SE2d 208) (1996).

1. Vergara contends that his March 26 interview and his subsequent statements to police throughout that afternoon and evening and in the early morning of March 27 were involuntary and, therefore, inadmissible under OCGA § 24-3-50, and that the evidence discovered as a result of those statements should also be suppressed. OCGA § 24-3-50 states that, "[t]o make a confession admissible, it must have been made voluntarily, without being induced by another by the slightest hope of benefit or remotest fear of injury."

At the outset, we reject the State's argument that OCGA § 24-3-50 does not apply to Vergara's statements to law enforcement because they constitute incriminating statements rather than a confession. See *Clarke v. State*, 165 Ga. 326, 331 (6) (140 SE 889) (1927) (distinguishing between incriminating statements and confessions). It has long been the law in this State that the rule as to the admissibility of an incriminatory statement is the same as that applied to a confession. *Turner v. State*, 203 Ga. 770, 771 (3) (48 SE2d 522) (1948). See also *Fuller v. State*, 109 Ga. 809, 811-812 (1) (35 SE 298) (1900); *Fletcher v. State*, 90 Ga. 468, 469 (1) (17 SE 100) (1892). To the extent that *Carruthers v. State*, 272 Ga. 306, 313 (5) (528 SE2d 217) (2000); *Hill v. State*, 279 Ga. App. 402, 405 (3) (a), fn. 4 (631 SE2d 446) (2006); *Pasuer v. State*, 271 Ga. App. 259, 261 (1) (609 SE2d 193) (2005); and *Jewett v. State*, 264 Ga. App. 571, 572 (1) (591 SE2d 459) (2003) hold otherwise, they are overruled.

Applying the nine factors found in *Reinhardt v. State*, 263 Ga. 113, 115 (3) (b) (428 SE2d 333) (1993), the State also argues that Vergara's statements were voluntary under the totality of the circumstances. We note that this Court originally adopted that nine-factor analysis from the United States Court of Appeals for the Fifth Circuit, as a method for determining the voluntariness of juvenile confessions given outside the presence of the juvenile's parents. *Riley v. State*, 237 Ga. 124, 128 (226 SE2d 922) (1976) (citing *West v. United States*, 399 F2d 467, 469 (5th Cir. 1968)). However, *Reinhardt* inexplicably applied to an adult's confession the nine *Riley* factors as set forth in *Williams v. State*, 238 Ga. 298, 302 (1) (232 SE2d 535) (1977), a case involving a juvenile's confession. *Reinhardt v. State*, supra. While some of those factors are often relevant in determining whether an adult's confession is voluntary under the totality of the circumstances, we have repeatedly held that the explicit nine-factor analysis set forth in *Riley*, which is the same analysis found in *Reinhardt*,

applies only to the confessions of juveniles and not to those of adults. *King v. State*, 273 Ga. 258, 260 (3) (539 SE2d 783) (2000); *McDade v. State,* 270 Ga. 654, 656 (3) (513 SE2d 733) (1999); *Hance v. State*, 245 Ga. 856, 858 (2) (268 SE2d 339) (1980). To the extent the following cases state or imply otherwise, they are overruled: *Henley v. State*, 277 Ga. 818, 821 (3) (596 SE2d 578) (2004); *State v. Roberts*, 273 Ga. 514, 515 (2) (543 SE2d 725) (2001); *Reinhardt v. State*, 263 Ga. 113, 115 (3) (b) (428 SE2d 333) (1993); *Moyer v. State*, 275 Ga. App. 366, 372-373 (4) (620 SE2d 837) (2005); *State v. Wilson*, 257 Ga. App. 120, 124-125 (570 SE2d 409) (2002); *Kunis v. State*, 238 Ga. App. 323, 323 (1) (518 SE2d 725) (1999); *Mao v. State*, 222 Ga. App. 482, 483 (474 SE2d 679) (1996).

Because Vergara was 20 years old at the time of his statements, they are admissible if, considering the totality of the circumstances, they were "made voluntarily, without being induced by hope of benefit or coerced by threats. [Cit.]" *Reynolds v. State*, 275 Ga. 548, 549-550 (3) (569 SE2d 847) (2002). Vergara contends that his statements were involuntary because the police made and then shook hands on an unqualified promise to him that anything he said to them would not be made known in court, thereby vitiating his *Miranda* rights. See *Spence v. State*, 281 Ga. 697, 699-700 (2) (642 SE2d 856) (2007).

The trial court found that Vergara's March 26 statements were voluntary because he was not in custody at the time of that interview and, therefore, *Miranda* was inapplicable. See *Wiggins v. State*, 280 Ga. 627, 629 (2) (a) (632 SE2d 80) (2006). However, regardless of whether Vergara was in custody for *Miranda* purposes at the time of the interview, in order for his statements to be admissible, they must be voluntary. See *Griffin v. State*, 230 Ga. App. 318, 322 (496 SE2d 480) (1998) (stating that, by enacting OCGA § 24-3-50, "the Georgia General Assembly deemed inadmissible *all* involuntary confessions" (emphasis in original)).

The trial court alternatively found that Vergara voluntarily waived his *Miranda* rights. Such a waiver would not be voluntary if, as Vergara contends, the police made a promise to him that was inconsistent with his constitutional rights. See *Foster v. State*, 258 Ga. 736, 742 (8) (b) (374 SE2d 188) (1988). However, *Miranda* does not apply if the evidence authorized the trial court's finding that Vergara was not in custody during the March 26 interview. *Wiggins v. State*, supra. The trial court made no findings regarding the scope of the promise to Vergara and the agreement upon which the officers and Vergara shook hands. No remand is necessary, however, because "[w]here controlling facts are not in dispute, . . . such as those facts discernible from a videotape, our review is de novo." *Lyons v. State*, 244 Ga. App. 658, 659 (535 SE2d 841) (2000).

The evidence presented at the hearings held pursuant to *Jackson v. Denno*, 378 U. S. 368 (84 SC 1774, 12 LE2d 908) (1964) establishes that, until Soto's arrest and interview, the officers viewed Vergara not as a suspect but only as a possible witness. The trial court properly found that the March 26 interview was not custodial. The officers testified that Vergara voluntarily accompanied them to the LEC, that he was never handcuffed, that he called his wife several times throughout the day, that he went to the bathroom alone, and that he chose to remain at the LEC voluntarily. See *Hightower v. State*, 272 Ga. 42, 43 (2) (526 SE2d 836) (2000) (no custodial situation exists where "a reasonable person in [the accused's] position would have concluded that he was not under formal arrest and that his freedom was not restrained to the extent associated therewith"). See also 2 LaFave, Criminal Procedure § 6.6 (f), pp. 749-752 (3d ed. 2007) (discussing circumstances under which interrogation is less likely to be custodial). Furthermore, the videotape played before the trial court and its translated transcription, to which the State and Vergara stipulated, support the officers' undisputed testimony that Vergara was not the focus of their investigation at the time of the March 26 interview. The videotape shows that Vergara was agreeable and cooperative, and that the officers were friendly and respectful toward him. After explaining his rights to him as "part of [a] department rule," Spindola told Vergara that he did not have to talk to them and could decide at any time "not to talk anymore." When Vergara asked, "[B]ut what happens to me?" Spindola replied, "I can't do anything to you. You understand me?" After indicating that he did understand, Vergara voluntarily consented to the interview, stating, "I can answer all your questions."

As for Vergara's allegation of an unqualified promise that his statements would not be made known in court, the relevant portions of the interview reveal that the alleged promise was made to him in response to his expressed fear of retribution for speaking with the officers. When Spindola encouraged Vergara to be honest in telling the officers what he had witnessed, Vergara said that he was afraid. Spindola told him that he did not want Vergara's children "to go through life with [Vergara] hiding, in fear," and that the officers knew that the situation was difficult for him, because one of the victims had been his friend. When Vergara acknowledged this friendship with one of the victims and reiterated his fear, Spindola responded by assuring him as follows:

> No one is going to know that you spoke to us. Like I told you, and I give you my word, . . . if this one day goes to court . . . no one is going to know that [Vergara] said anything. . . . [N]o one is going to receive information that you gave us.

Moments later, Spindola told Vergara, "We have to get the person that killed them. What is it that happened that day?" Vergara responded, "I know if I tell you, if they find out, they're going to want to do something to me." Spindola assured him that "no one is going to know your name." Almost immediately, Spindola asked Vergara again, "What happened? Who was it that killed those guys?" Vergara asked, "Do you promise you're not going to tell him?" In response, Spindola stated, "I'll shake your hand." As he did so, he promised Vergara that nothing would happen to him. Then the other officers also shook his hand. Following this exchange, Vergara implicated Soto as the one who killed the victims. Throughout the remainder of the approximately one and a half hour interview, the officers continued to assure Vergara that Soto would not know that he had "talked to anybody" until Soto was in jail.

Vergara contends that his case is analogous to that of *Spence v. State*, supra, in which the defendant's confession was obtained during a post-arrest custodial interrogation during which the detective made a statement to the defendant that their interview was "confidential." Finding that it would have been reasonable for the defendant in that case to understand the statement to mean that what the defendant told the detective "would be kept confidential between the two of them, and would not be disclosed to anyone else," this Court held that the detective's statement was inconsistent with the *Miranda* warnings and, thus, that the defendant's confession was inadmissible. *Spence v. State*, supra. See also *Foster v. State*, supra; *Hopkins v. Cockrell*, 325 F3d 579, 584-585 (5th Cir. 2003). However, unlike the defendants in *Spence, Foster*, and *Hopkins*, Vergara was not in custody during the March 26 interview and, thus, the *Miranda* warnings were not required at that time. *Wiggins v. State*, supra. In each of those cases, the issue was whether a purported waiver of *Miranda* rights was voluntary in light of an officer's representation which contradicted the warnings, and not, as here, whether the defendant's statements themselves were voluntary. The only factor relied on by Vergara to support his contention that his March 26 statements were involuntary is the alleged promise that anything he said would not be made known in court. However, neither lying nor the use of trickery to obtain a confession will render an interviewee's statements inadmissible where, as here, " ' "the means employed are not calculated to procure an untrue statement." ' [Cit.]" *DeYoung v. State*, 268 Ga. 780, 789 (8) (493 SE2d 157) (1997). Specifically, the mere "fact that a confession has been made under . . . a promise of secrecy . . . shall not exclude it." OCGA § 24-3-51. These principles apply where, as here, the *Miranda* warnings are unnecessary due to the non-custodial setting, regardless of whether they were vitiated in some way or simply not given. See *State v. Parks*, 273 Ga. App. 682,

684 (616 SE2d 456) (2005); *Pinckney v. State*, 259 Ga. App. 309, 313 (2) (576 SE2d 574) (2003). Moreover, we conclude from our review of the videotape and from the totality of the circumstances that a reasonable person in Vergara's position would have understood from the context of the statements that the officers had agreed to ensure that Vergara's identity and the information he might disclose would not be revealed, in court or otherwise, in any manner that would place him in physical danger from Soto. See *People v. Gurule*, 51 P3d 224, 256-257 (I) (C) (1) (b) (Cal. 2002). Therefore, Spindola's statements did not constitute the type of promise that could render Vergara's statements involuntary under OCGA § 24-3-50. See *Taylor v. State*, 274 Ga. 269, 273 (2) (553 SE2d 598) (2001) (generally, reward of a lighter sentence is the "hope of benefit" to which OCGA § 24-3-50 refers); *Pinckney v. State*, supra. Considering the exchange between Vergara and the officers in its entirety, we find that this case is both factually and legally distinguishable from *Spence*.

Based on the same analysis, we also conclude that the statements made to Vergara were not such as to vitiate his *Miranda* warnings and waiver that occurred immediately prior to his 12:45 a.m. custodial interview. Moreover, Vergara's statements at that interview were quite remote from, and not prompted by, the alleged promise at the earlier interview. *Carswell v. State*, 268 Ga. 531, 533 (2) (491 SE2d 343) (1997). Our review of the record shows that the trial court was authorized to find that Vergara made a knowing and voluntary waiver of his *Miranda* rights prior to the 12:45 a.m. interview. *Bright v. State*, 265 Ga. 265, 280 (5) (b) (455 SE2d 37) (1995). Consequently, the trial court did not err in refusing to suppress Vergara's March 26 statements, his custodial statements made in the early morning of March 27, and all evidence derived from those statements.

2. On March 27, 2002, Vergara made his "first appearance" before the Magistrate Court of Hall County, where he was formally charged with two counts of murder and where he made a request for counsel, who was appointed on that date. The following day, Spindola interviewed Vergara again. As a result of that interview, police obtained a quantity of cocaine from Vergara's residence.

Where a defendant asserts his right to counsel at his initial appearance, his Sixth Amendment right to counsel attaches. *O'Kelley v. State*, 278 Ga. 564, 568 (2) (604 SE2d 509) (2004). In order for Vergara's subsequent statement on March 28 to be admissible, Vergara must have initiated further contact with the police. *Michigan v. Jackson*, 475 U. S. 625 (106 SC 1404, 89 LE2d 631) (1986) (holding that "bright-line rule" of *Edwards v. Arizona*, 451 U. S. 477 (101 SC 1880, 68 LE2d 378) (1981) also applies to a defendant who has been formally charged with a crime and who has requested

appointment of counsel). The translated transcript of the audiotaped interview, to which the State and Vergara stipulated, supports the trial court's finding that Vergara had requested to speak with Spindola, as Vergara responded affirmatively to the investigator's statement that he was there because he was told that Vergara wanted to talk to him. However, the "initiation" inquiry is only the first step of a two-step analysis. *Walton v. State*, 267 Ga. 713, 716 (3) (482 SE2d 330) (1997) (citing *Oregon v. Bradshaw*, 462 U. S. 1039 (103 SC 2830, 77 LE2d 405) (1983)). Even where the accused initiated the conversation, it must then be determined, under the totality of the circumstances, whether he made a valid waiver of the rights to counsel and to remain silent. *Walton v. State*, supra. See also *McDougal v. State*, 277 Ga. 493, 499-500 (1) (c) (591 SE2d 788) (2004).

The undisputed evidence shows that Spindola neither reread nor reminded Vergara of his *Miranda* rights. While Spindola did tell Vergara that he did not have to speak with him, neither the investigator nor Vergara mentioned an attorney or whether Vergara intended to speak without one. Before Vergara said anything regarding when or why he had summoned Spindola, the investigator thoroughly reprimanded Vergara for not being truthful during the March 26 interview. Spindola immediately inquired about the current location of the cocaine. Moreover, most of Vergara's statements were in response to Spindola's recommencement of the interrogation. "Based upon the totality of the circumstances, we cannot conclude that [Vergara] wished to waive his previously-invoked right to counsel and resume answering questions about the case." *McDougal v. State*, supra (no waiver of previously invoked right to counsel where suspect summoned detectives but made no mention of an attorney, and his only statements were in response to detective's interrogation). Compare *Sanders v. State*, 182 Ga. App. 581, 582-583 (1) (356 SE2d 537) (1987) (suspect waived previously invoked right to counsel when he reinitiated conversation with the police, was reminded that he had asked for a lawyer, and said he wanted to continue making a statement). Therefore, the trial court erred in ruling Vergara's March 28 statement admissible.

The State contends that, even if this Court finds that Vergara's statement must be suppressed, the cocaine obtained as a result of that statement is still admissible because the exclusionary rule does not apply to evidence derived from a voluntary statement obtained in violation of prophylactic rules, which, while designed to protect suspects' constitutional rights, are not themselves constitutional. See *Taylor v. State*, supra at 276 (4). However, Vergara argues that, if his statement is held inadmissible, the cocaine should also be suppressed under the fruit of the poisonous tree doctrine because it was derived from a constitutional violation. See *Nix v. Williams*, 467

U. S. 431, 442 (II) (B) (104 SC 2501, 81 LE2d 377) (1984); *Wilson v. Zant*, 249 Ga. 373, 378 (1) (290 SE2d 442) (1982) ("the 'fruit' of a statement which was obtained in violation of a constitutional right must be suppressed"), overruled on other grounds, *Morgan v. State*, 267 Ga. 203, 204-205 (2) (476 SE2d 747) (1996).

It is true that *Michigan v. Jackson*, supra,

> established a prophylactic rule that once a criminal defen-
> dant invokes his Sixth Amendment right to counsel, a sub-
> sequent waiver of that right — even if voluntary, knowing,
> and intelligent under traditional standards — is presumed
> invalid if secured pursuant to police-initiated conversation.

*Michigan v. Harvey*, 494 U. S. 344, 345 (110 SC 1176, 108 LE2d 293) (1990). In Vergara's case, however, this Court is not presented with a situation in which a defendant's otherwise valid waiver is presumed invalid. Instead, this is a case in which the State, even apart from the *Jackson* presumption, has failed to carry its burden of proving such a waiver. See *Brewer v. Williams*, 430 U. S. 387, 403-404 (III) (97 SC 1232, 51 LE2d 424) (1977); *Starks v. State*, 262 Ga. 244, 247 (3) (416 SE2d 520) (1992). As a result, Vergara's Sixth Amendment right to counsel, a constitutional right, was violated.

It appears that neither this Court nor the Supreme Court of the United States has addressed the scope of relief to be afforded a defendant who has suffered a constitutional violation in this precise context. See *Michigan v. Harvey*, supra at 354 (holding that a voluntary statement taken in violation of the *Jackson* prophylactic rule may be used to impeach a defendant's inconsistent testimony, but noting that the Court did not have before it facts presenting the issue of "the admissibility for impeachment purposes of a voluntary statement obtained in the absence of a knowing and voluntary waiver of the right to counsel"); 3 LaFave, supra at § 9.6 (a), p. 492 (noting the importance of the fact that the *Harvey* majority "did *not* hold that the fruits of a violation of the Sixth Amendment right to counsel may be used for purposes of impeachment" (emphasis in original)). However, the fruit of the poisonous tree doctrine has been applied in other Sixth Amendment right to counsel cases. See *Nix v. Williams*, supra (in-criminating statements obtained in violation of right to counsel by police-initiated conversation from defendant who had been arraigned and had retained lawyer); *United States v. Wade*, 388 U. S. 218 (87 SC 1926, 18 LE2d 1149) (1967) (violation of right to counsel at post-indictment line-up); *United States v. Terzado-Madruga*, 897 F2d 1099 (11th Cir. 1990) (incriminating statements pertaining to pending charges obtained through government informant in violation of right to counsel).

In taking this approach, courts have recognized that, because the Sixth Amendment right to counsel is fundamental to our adversarial system of justice, once that right

> has attached and been asserted, the State must . . . honor it. . . . [A]t the very least, the prosecutor and police have an affirmative obligation not to act in a manner that circumvents and thereby dilutes the protection afforded by the right to counsel.

*Maine v. Moulton*, 474 U. S. 159, 170-171 (II) (B) (106 SC 477, 88 LE2d 481) (1985). In order to deter police conduct that would deny an accused that right, courts have applied the fruit of the poisonous tree doctrine

> to exclude evidence seized as a result of such violations notwithstanding the high social cost of letting persons obviously guilty go unpunished for their crimes. On this rationale, the prosecution is not to be put in a better position than it would have been in if no illegality had transpired.

*Nix v. Williams*, supra at 443 (II) (B). At the same time, "the prosecution is not [to be] put in a *worse* position simply because of some earlier police error or misconduct." (Emphasis in original.) *Nix v. Williams*, supra (adopting the inevitable discovery exception to the fruits doctrine). Accordingly, under the fruits doctrine as explicated by the Supreme Court and adopted by this Court, we

> need not hold that all evidence is "fruit of the poisonous tree" simply because it would not have come to light but for the illegal actions of the police. . . . [T]he more apt question . . . is "whether . . . the evidence . . . has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." [Cit.]

*Wong Sun v. United States*, 371 U. S. 471, 487-488 (III) (83 SC 407, 9 LE2d 441) (1963). See also *Griffin v. State*, 229 Ga. 165, 166 (1) (190 SE2d 61) (1972) (proper test to determine admissibility of in-court identification was whether it was "purged of the primary taint" of illegal line-up identification); 3 LaFave, supra at § 9.3, pp. 418-439 (discussing fruit of the poisonous tree theories), § 9.5 (b), p. 476. We thus conclude that the fruits doctrine provides the proper remedy here, as it appropriately balances "the fundamental importance of the right to counsel in criminal cases" with "the necessity for preserving

society's interest in the administration of criminal justice." *United States v. Morrison*, 449 U. S. 361, 364 (101 SC 361, 66 LE2d 564) (1981).

A review of the evidence shows that, during the March 28 interview, Vergara indicated that the cocaine might be at his home, and Spindola told him that he would arrange for them to go there together to retrieve it. Directly after the interview, Spindola and another officer escorted Vergara to his residence. After Vergara's wife allowed them inside, Spindola followed Vergara throughout his house and then outside to the front yard as he searched for the cocaine, which was eventually located in a large plastic trash can in the driveway. Spindola himself testified that the discovery of the cocaine was a direct result of his interview with Vergara, and the State has offered no evidence to establish that the cocaine "had ' "become so attenuated [from the primary illegality] as to dissipate the taint." ' [Cit.]" *Spence v. State*, supra at 700 (3). See also *Brown v. Illinois*, 422 U. S. 590, 603-604 (III) (95 SC 2254, 45 LE2d 416) (1975) (setting out factors to consider in determining attenuation). Nor has the State offered any evidence establishing that there was "a genuinely independent source for the discovery of the [cocaine]," *Price v. State*, 270 Ga. 619, 623 (2) (513 SE2d 483) (1999), or that it inevitably would have been discovered by lawful means. *Taylor v. State*, supra at 274 (3).

We also find no merit in the State's argument that the cocaine is admissible because Vergara had abandoned it in the trash and "[t]he Fourth Amendment does not prohibit the warrantless search and seizure of garbage left for collection at the curb outside the home." *Perkins v. State*, 197 Ga. App. 577, 579 (1) (398 SE2d 702) (1990) (citing *California v. Greenwood*, 486 U. S. 35 (108 SC 1625, 100 LE2d 30) (1988)). Where physical evidence discovered as a consequence of a defendant's inadmissible statement is suppressed as the result of the fruits doctrine, the defendant need not have standing to object to the search in which that evidence is found. 3 LaFave, supra at § 9.5 (b), pp. 476-477. It is sufficient that the defendant has standing as to the confession, which, in this case, Vergara does. *Sims v. State*, 243 Ga. 83, 85 (2) (252 SE2d 501) (1979) (the only person with standing to complain of the admission of fruits gained from an illegally obtained confession is the person who made the confession). Therefore, the cocaine seized as a result of Vergara's March 28 statement must also be suppressed.

*Judgment affirmed in part and reversed in part. All the Justices concur.*

DECIDED FEBRUARY 25, 2008.

*Valpey & Parks, Leonard C. Parks, Jr., Weaver & Parr, Michael L. Weaver, Sr.*, for appellant.

*Lee Darragh, District Attorney, Alison W. Toller, Assistant District Attorney, Thurbert E. Baker, Attorney General, Susan V. Boleyn, Senior Assistant Attorney General*, for appellee.