A11A2381. BOYD v. THE STATE.
(726 SE2d 746)

ADAMS, Judge.

Darrell Emmanuel Boyd, Jr., was convicted by a jury of armed robbery, possession of a firearm during the commission of a felony and violating the Georgia Firearms and Weapons Act by possession of a sawed-off shotgun; he was sentenced to 20 years to serve 12.[1] He appeals following the denial of his motion for new trial, arguing that the trial court erred by admitting his in-custody statement into evidence at trial and by admitting show-up identification testimony.

1. Boyd first argues that the trial court erred by finding that he knowingly and voluntarily waived his constitutional right to self-incrimination so as to authorize the admission of his in-custody incriminating statement. We agree and reverse.

Although the State had the burden of proving the admissibility of the incriminating statement by a preponderance of the evidence,

[c]onfessions of juveniles must be scanned with more care and received with greater caution than those of adults. *Crawford v. State*, 240 Ga. 321, 323 (1) (240 SE2d 824) (1977). (T)he question of a voluntary and knowing waiver

---

[31] Id.

[1] The record shows that two of Boyd's co-defendants entered guilty pleas to the lesser included offense of robbery and the other offenses were nol-prossed. The co-defendants received sentences of seven to serve three and ten to serve four respectively and were also accorded first offender treatment. Another defendant, with whom Boyd was tried, was found not guilty.

depends on the totality of the circumstances(,) and the (S)tate has a heavy burden in showing that the juvenile did understand and waive his rights. . . . Id.

(Punctuation omitted.) *Swain v. State*, 285 Ga. App. 550, 551-552 (647 SE2d 88) (2007). E.g., *Nelson v. State*, 289 Ga. App. 326, 328 (1) (657 SE2d 263) (2008).

However, as our Supreme Court has further explained, "age alone is not determinative of whether a person can waive his rights. Instead, the question of waiver must be analyzed by a consideration of several factors." *Riley v. State*, 237 Ga. 124, 128 (226 SE2d 922) (1976). Those factors include

(1) age of the accused; (2) education of the accused; (3) knowledge of the accused as to both the substance of the charge . . . and the nature of his rights to consult with an attorney and remain silent; (4) whether the accused is held incommunicado or allowed to consult with relatives, friends or an attorney; (5) whether the accused was interrogated before or after formal charges had been filed; (6) methods used in interrogations; (7) length of interrogations; (8) whether vel non the accused refused to voluntarily give statements on prior occasions; and (9) whether the accused has repudiated an extra judicial statement at a later date.

Id.

On appeal, we accept the trial court's findings on disputed facts and credibility issues unless clearly erroneous. *Norris v. State*, 282 Ga. 430, 431 (2) (651 SE2d 40) (2007); *State v. Rodriguez*, 274 Ga. 728 (559 SE2d 435) (2002). "However, (w)here controlling facts are not in dispute, . . . such as those facts discernible from a videotape, our review is de novo. (Cit.)"[2] (Citation and punctuation omitted.) *Sosniak v. State*, 287 Ga. 279, 280 (1) (695 SE2d 604) (2010) (involved both conflicting testimony at suppression hearing and videotaped interviews). *Vergara v. State*, 283 Ga. 175, 178 (657 SE2d 863) (2008); *State v. Brown*, 308 Ga. App. 480, 482 (708 SE2d 63) (2011); *State v. Roberts*, 273 Ga. 514, 514-515 (1) (543 SE2d 725) (2001), overruled on other grounds by *Vergara*, 283 Ga. at 178 (1) (videotape of an

---

[2] By quoting this statement, we are in no way failing to give proper deference to the trial court's factual and credibility determinations concerning testimony presented at the motion to suppress hearing, although we do note that the trial court in this case did not make any specific factual findings in its order denying the motion to suppress. Further, in our view the "controlling facts" in this case are discerned from the recording of the interrogation.

interrogation viewed as "demonstrative objective proof of the circumstances surrounding [an] inculpatory statement"). In any event, we independently apply the legal principles to the facts.

Turning to the facts here, the record and transcripts show that Boyd was 15 years old and in the ninth grade at the time he was interviewed.[3] Boyd was arrested and taken into custody within hours of the crime, after he had been identified by the victim as the person who brandished the sawed-off shotgun during the robbery. He was handcuffed and placed alone in an interview room; the recording equipment was activated at approximately 2:08 a.m., and the officer conducting the interview, Corporal Eric Osterberg, began interviewing Boyd at about 2:20 a.m.

Osterberg began by asking Boyd general background questions, and Boyd could not tell the officer his street address or whether he lived in Norcross or Lilburn, but described generally for the officer where his home was located. He gave the officer his mother's cell phone number, but said he did not live with his mother and that she lived in College Park. He told the officer he lived with his father, gave the officer his father's cell phone number, and said his father "should be" home at that time.

Osterberg then told Boyd he was going to read him his *Miranda* rights as if Boyd was reading them to himself; in other words, Osterberg read Boyd his rights, using a form which was intended to be read by the suspect, in the first person singular, using the pronoun "I," instead of using the pronoun "you."

Osterberg then asked Boyd if he understood his rights, and Boyd gave a slight nod of his head; Osterberg asked Boyd if he had any questions, and Boyd indicated he did not by a slight shake of his head, again giving a slight nod of his head when Osterberg asked him if he understood his rights fully. Osterberg then asked Boyd if he was ready, "with those rights in mind, . . . to go ahead and continue this interview and kind of straighten out what in the hell happened this evening." Boyd did not respond, and Osterberg queried "Understand?" and Boyd slightly nodded his assent. Osterberg then asked Boyd again whether he wanted to go ahead and get it straightened out now, and Boyd hesitated and then responded "Yeah."

Osterberg proceeded to question Boyd about the events of that night. While pressing Boyd about who owned the gun used during the robbery, Boyd stated he did not know but then blurted out that "he did

---

[3] Presumably Boyd was in the early part of his ninth grade year since the crime occurred in September.

it though," meaning he was the one who held it during the robbery. Boyd also mentioned several times in the interview that the gun was not loaded.

Placing these facts in the context of the *Riley* factors, we note first that Boyd was only 15 years old and in the ninth grade and, for whatever reason, could not provide the officer with certain details such as his street address. The interview did not start until almost 2:30 a.m., and Osterberg acknowledged that Boyd appeared tired but said Boyd was not so tired that he lost track of what was going on during the interview. It does not appear that Osterberg asked Boyd if he wanted anything to drink before he began the interview, and when the interview was over Boyd immediately asked for something to drink.

The recording further reveals that Boyd gave Osterberg the necessary contact information for his parents and Osterberg stated at the hearing that he thought one of the other officers may have tried to contact Boyd's father, but Osterberg did not mention that fact to Boyd or ask him if he wanted to wait until his father had been reached before proceeding with the interview. As our Supreme Court has held, "[a] parent's presence . . . is a significant factor in support of a finding of waiver," *Norris*, 282 Ga. App. at 431 (2), although it is equally true that a parent's presence is not required and that we do not have a per se rule that such statements should be excluded. Further, although Osterberg informed Boyd of his rights, including his right to have a parent or attorney present, these rights were unnecessarily read in a way that might have confused an adult, much less a 15-year-old being interviewed at 2:30 a.m.[4] And although Boyd did acknowledge understanding his rights, he did so using minimal head gestures, even though up to that point he had been verbalizing his responses to the officer.

While the above circumstances might give us cause to question whether the waiver of rights here was knowingly and intelligently made, it is the next part of the interview, coupled with these circumstances, that leads us to conclude that Boyd's statement should not have been admitted at trial. At this juncture of the interview Boyd had been arrested but not charged, and more importantly, Osterberg had not revealed to Boyd that he might be charged with serious felony offenses, such as armed robbery and various weapons violations,[5]

---

[4] The dissent "doubt[s] that 2:30 a.m. is an especially late hour for many teenagers." But the videotape shows, and Osterberg admitted, that Boyd was tired.

[5] The dissent states that the record "supports the conclusion that Boyd understood the basis of the charges against him . . . ." But the trial court did not make any findings about what Boyd may or may not have understood concerning the charges he might be facing, and in light

before the officer entreated him to "straighten out what in the hell happened this evening." When Boyd did not immediately respond, Osterberg pressed Boyd to go ahead and "get it straightened out now." Boyd continued to hesitate, but then responded "Yeah." As our Supreme Court has noted "the method that police used in the interrogation, including whether they made threats or promises, is a significant factor in evaluating the voluntariness of the waiver . . . ." *Rodriguez*, 274 Ga. at 729. Osterberg's statement, while not an outright promise,[6] could easily have caused a juvenile offender, uninformed about what serious charges he might be facing, and knowing that the shotgun was not loaded, to believe that the situation could be "straightened out" if he talked to the officer. Further, it is apparent Osterberg knew prior to starting the interview that Boyd was going to be charged whether he talked to him or not since the victim had already identified Boyd as the person who brandished the shotgun during the robbery. And although this method of interrogation may be permissible, particularly when interviewing an adult, we believe these methods may be ill-advised when interviewing a juvenile, in light of the additional scrutiny to which these procedures must be subjected.[7] This is particularly true where, as here, the juvenile was interrogated without the aid of an attorney or a parent, and without being advised of the very serious charges he could be facing. Cf. *Allen v. State*, 283 Ga. 304, 305 (2) (a) (658 SE2d 580) (2008) (15-year-old was directly asked concerning whether he wanted his mother present, not just advised he could have her present, and juvenile was told that he was under arrest for murder and was going to be held at a juvenile detention center whether he talked to them or not); *Norris*, 282 Ga. at 431-432 (2) (trial court did not err by finding knowing and voluntary waiver of rights when interview conducted at 3:30 a.m., juvenile had access to food, drink and a restroom, juvenile's

---

of Boyd's statements to the officer that he and his co-defendants knew the gun was not loaded, we should not assume that this 15-year-old knew that he was facing armed robbery charges.

[6] Although it did not explicitly do so, the trial court implicitly rejected Boyd's testimony, which Osterberg disputed, that the officer threatened to "bury him under the jail" if he did not talk to him, and we defer to that credibility determination on appeal.

[7] Although the dissent opines that it is not our job to grade the police, it is our job to consider the method used during the interrogation when we are determining the admissibility of a juvenile's statement. Further, we stress that it is not just the method of interrogation here, but the totality of the circumstances that has led us to conclude the statement should not have been admitted. And, in our view, it is the dissent's piecemeal approach which misses the mark. Further, in light of the fact that the admissibility of an incriminating statement of a juvenile is analyzed differently than that of an adult, see *Vergara*, 283 Ga. at 177-178 (1), we fail to see how it is a stretch to say that certain interrogation methods may be permissible for an adult but not for a juvenile. See *J. D. B. v. North Carolina*, ___ U. S. ___ (131 SC 2394, 2403, 180 LE2d 310) (2011) (quoted infra).

parent was present for the entire interview, and the mother was told the juvenile was a suspect prior to the interview).

Based on the foregoing, and considering the totality of the circumstances,[8] we cannot agree with the trial court that the State met its burden of showing that the statement here was made voluntarily after a knowing and intelligent waiver of rights. Although it would be easy to find otherwise if we ended our analysis at the point where Boyd gave an affirmative indication that he understood and waived his rights, such a result would, in our opinion, mean that only mere lip service need be paid to consideration of the factors that are relevant in determining the admissibility of an in-custody statement of a juvenile. As the United States Supreme Court recently explained in finding that age is a factor in determining whether a juvenile is in custody for purposes of *Miranda*:

> A child's age is far more than a mere chronological fact. It is a fact that generates commonsense conclusions about behavior and perception. Such conclusions apply broadly to children as a class. And, they are self-evident to anyone who was a child once himself, including any police officer or judge.
>
> Time and again, this Court has drawn these commonsense conclusions for itself. We have observed that children generally are less mature and responsible than adults, [cit.]; that they often lack the experience, perspective, and judgment to recognize and avoid choices that could be detrimental to them, [cit.]; that they are more vulnerable or susceptible to . . . outside pressures than adults, [cit.]; and so on. Addressing the specific context of police interrogation, we have observed that events that would leave a man cold and unimpressed can overawe and overwhelm a lad in his early teens. [Cits.] . . . Describing no one child in particular, these observations restate what any parent knows — indeed, what any person knows — about children generally. [Cit.]

*J. D. B. v. North Carolina*, ___ U. S. ___ (131 SC 2394, 2403, 180 LE2d 310) (2011).

---

[8] While not specifically addressing several of the factors, we note that there is no evidence that Boyd refused to give a statement on prior occasions or repudiated the statement which is under review.

We think these observations provide pertinent perspective to the present case, and compel us to conclude that the trial court erred by admitting Boyd's statement under the totality of the circumstances of this case.

2. However, we find no error in the admission of evidence that the victim identified Boyd as the person who brandished the shotgun during a show-up identification procedure conducted shortly after the crime was committed. Although the victim was told by an officer that there were some "similarities," the officer also testified that he told the victim that police did not know if the people they had detained were involved or "related" to the crime, and testified that he did not at any time during the show-up attempt to lead the victim toward an identification. Having considered all the circumstances surrounding the show-up procedure, we find that the trial court did not clearly err by admitting the identification evidence in this case. E.g., *Billingsley v. State*, 294 Ga. App. 661, 662 (1) (669 SE2d 699) (2008); *Horne v. State*, 260 Ga. App. 640, 643 (4) (580 SE2d 644) (2003). Moreover, the fact that the victim could not identify Boyd at trial, while certainly something for the jury to consider, did not render this evidence inadmissible particularly since the pre-trial identification was based at least in part on Boyd's clothing and hairstyle at that time, and his facial features were at least partially concealed during the robbery. This enumeration thus affords no basis for reversal.

*Judgment reversed. Ellington, C. J., Barnes, P. J., Phipps, P. J., Doyle, P. J., and Miller, J., concur. Blackwell, J., concurs in part and dissents in part.*

BLACKWELL, Judge, concurring in part and dissenting in part.

When Darrell Emmanuel Boyd, Jr., agreed to give a statement to an investigator, he did not, the majority concludes, knowingly and voluntarily waive his constitutional privilege against self-incrimination. Along the way to this conclusion, the majority, I think, gives too little deference to the considered judgment of the court below, pays too little attention to important evidence that the waiver was knowing and voluntary, and in the end, misapplies the relevant legal standard to the facts that appear from the record. Based on my review of the precedents and the evidence in this case, I conclude that Boyd did knowingly and voluntarily waive his privilege, and for that reason, I respectfully dissent with respect to Division 1 of the majority opinion.[9]

---

[9] I concur fully in Division 2 of the majority opinion.

When the State offers evidence in its case-in-chief that the accused made an incriminating statement in the course of a custodial interview, it must prove that the accused knowingly and voluntarily waived his constitutional rights that pertain to such an interview, including his privilege against self-incrimination. *J. D. B. v. North Carolina*, ___ U. S. ___ (II) (A) (131 SC 2394, 180 LE2d 310) (2011). To determine whether a waiver was knowing and voluntary, the courts look to the totality of the circumstances. *Reed v. State*, 285 Ga. 64, 64-65 (3) (673 SE2d 246) (2009). In the case of a waiver by a minor child, such as Boyd, the courts still look to the totality of the circumstances, but they must give special attention to nine particular circumstances, namely:

> (1) age of the accused; (2) education of the accused; (3) knowledge of the accused as to both the substance of the charge and the nature of his rights to consult with an attorney and remain silent; (4) whether the accused is held incommunicado or allowed to consult with relatives, friends or an attorney; (5) whether the accused was interrogated before or after formal charges had been filed; (6) methods used in interrogations; (7) length of interrogations; (8) whether vel non the accused refused to voluntarily give statements on prior occasions; and (9) whether the accused has repudiated an extra judicial statement at a later date.

*Riley v. State*, 237 Ga. 124, 128 (226 SE2d 922) (1976) (citation and punctuation omitted). See also *Green v. State*, 282 Ga. 672, 673-674 (2) (653 SE2d 23) (2007); *In the Interest of C. H.*, 306 Ga. App. 834, 835-836 (2) (703 SE2d 407) (2010). But even in the case of a minor, the State is only required to prove a knowing and voluntary waiver by a preponderance of the evidence.[10] See *Swain v. State*, 285 Ga. App. 550, 552 (647 SE2d 88) (2007); *In the Interest of R. J. C.*, 210 Ga. App. 286, 289 (435 SE2d 759) (1993).

When we review the denial of a motion to suppress a statement given in a custodial interview, we owe no deference to the way in which the court below resolved questions of law, but we owe substantial deference to the way in which it resolved disputed questions of

---

[10] The majority relies on the references in *Riley* and other cases to the "heavy burden" of the State. See *Riley*, 237 Ga. at 128. To be sure, the burden is somewhat heavier in cases involving children because of the special attention given to the nine *Riley* factors and the common-sense notion that, generally speaking, it is more difficult to show a knowing and voluntary waiver by a child than by an adult. But it is still a burden that can be carried by a preponderance of evidence.

fact and assessed the credibility of witnesses, yielding to its findings about such things unless the findings are clearly erroneous. See *Watkins v. State*, 289 Ga. 359, 363 (4) (711 SE2d 655) (2011). And on appeal, we must view the evidence in the light most favorable to the decision below. See *Wilson v. State*, 211 Ga. App. 457, 458 (1) (439 SE2d 685) (1993). The majority acknowledges the standard of review, but it goes on to say that, when the facts are "discernible from a videotape," we can discern the facts ourselves and owe no deference to the findings of the court below. That is true enough, but in this case, not *all* of the material facts are discernible from the video recording of the custodial interview. In addition to the recording, the court below also heard and considered the testimony of the interviewing investigator and Boyd himself. As this Court previously has acknowledged, when facts are found on a motion to suppress from evidence that includes both a recording of a custodial interview and courtroom testimony, we defer to the findings of the trial court about such facts unless clearly erroneous. *State v. Floyd*, 306 Ga. App. 402, 402, n.1 (702 SE2d 467) (2010). See also *State v. Folsom*, 286 Ga. 105, 111 (4) (686 SE2d 239) (2009) (applying clearly erroneous standard where evidence included, but was not necessarily limited to, video recording of interrogation); *Wright v. State*, 285 Ga. 428, 431-432 (2) (677 SE2d 82) (2009) (same); *Reed*, 285 Ga. at 65 (3) (same). The *only* findings as to which we owe no deference to the trial court are those findings that pertain to facts on which the recording alone, and no other evidence, sheds light. When a trial judge had the opportunity to see and hear the testimony of those involved in a custodial interview — an opportunity that we, as appellate judges, do not have — we owe some deference to his assessment of whether the accused knowingly and voluntarily waived his rights. And especially when the accused himself testifies, the trial judge is in a unique position to assess the intelligence and maturity of the accused, as well as his understanding of legal principles and proceedings, all of which is relevant, of course, to the question of a knowing and voluntary waiver.[11] See *Murray v. State*, 276 Ga. 396, 397 (2) (578 SE2d 853) (2003) (noting that defendant, who was in the ninth grade, had no difficulty in understanding the proceedings at the motion to suppress hearing).

In this case, the courtroom testimony suggests important facts that cannot be discerned from the recording of the custodial interview. Boyd testified at the hearing on his motion to suppress that he

---

[11] Less deference might be owed when the trial court observes the accused at a point distant in time from his interview. But in this case, Boyd was interviewed in September 2007, and he testified on the motion to suppress his statement only about a year later, in October 2008.

agreed to an interview with the investigator only because the investigator, Boyd said, had threatened to "bury [him] under the jail" if he did not. The investigator denied that he made such a threat, and the court below was permitted, as it did, to assess the credibility of these witnesses and determine that Boyd had not testified truthfully. The majority appears to defer to this credibility determination and accept that no threat was made, but it does not follow through, as it must, and also defer to the inferences that a reasonable finder of fact might have drawn from the testimony that Boyd gave. Having concluded that Boyd was untruthful about the threat, the court below might properly have inferred from his testimony — in which Boyd said nothing about having misunderstood his rights, about having been too tired to think much about them, about having had no contact with his parents or a lawyer, or about having been deceived by encouragements to "straighten out what in the hell happened this evening" — that Boyd understood his rights well enough and knowingly and then voluntarily waived them. After all, if Boyd had been confused, or if his will had been overborne by the circumstances of the interview or the deceit of the investigator, surely he would have said so. Moreover, even without regard to the absence of testimony about these things, the court below might properly have inferred from the mere fact that Boyd was untruthful about a threat that he had no good grounds upon which to move to suppress his statement. See *Ferguson v. State*, 307 Ga. App. 232, 236 (1) (704 SE2d 470) (2010) ("So, if you can show that a plaintiff has been suborning false testimony, and has endeavored to have recourse to perjury, it is strong evidence that he knew perfectly well his cause was an unrighteous one.") (citation and punctuation omitted).

The testimony of the investigator who interviewed Boyd also is important. This investigator testified that Boyd showed no signs of disorientation or distress during the interview, and although Boyd seemed tired, he never "lost track of what was going on." It is well and good to consider what is depicted by a video recording of an interview, but the observations of a credible witness, who was seated across a table from the accused at a distance of only a couple of feet during the interview, also are entitled to some consideration. And the majority appears to give no deference to the facts that the court below might have found by viewing the recording *in light of* what the investigator said at the hearing. The majority, I think, gives too little deference to the considered judgment of the trial judge.

With the evidence presented at the hearing below, the burden of proof, and the deference appropriately owed to the court below in mind, I turn now to consider the totality of the circumstances of the interview, including the circumstances to which special attention

must be paid in the case of a minor and upon which the majority concludes that Boyd did not knowingly and voluntarily waive his rights.[12] With respect to the age of the accused, both this Court and our Supreme Court have said that minors fifteen years of age, and some even younger, are capable of making an informed decision to waive their constitutional rights and speak with police. See *Murray*, 276 Ga. at 397-398 (2) (upholding custodial statement of 15-year-old); *State v. McBride*, 261 Ga. 60, 63 (2) (b) (1) (401 SE2d 484) (1991) (15-year-old defendant); *Marshall v. State*, 248 Ga. 227, 229 (3) (1) (282 SE2d 301) (1981) (14-year-old defendant); *Williams v. State*, 238 Ga. 298, 302 (1) (232 SE2d 535) (1977) (14-year-old defendant); *In the Interest of C. H.*, 306 Ga. App. at 836 (2) (14-year-old defendant); *Swain*, 285 Ga. App. at 552 (15-year-old defendant); *Stone v. State*, 271 Ga. App. 748, 750 (1) (610 SE2d 684) (2005) (15-year-old defendant); *Martin v. State*, 256 Ga. App. 527, 529 (2) (a) (568 SE2d 754) (2002) (13-year-old defendant); *C. R. T. v. State*, 148 Ga. App. 628, 629 (252 SE2d 58) (1979) (11-year-old defendant). Similarly, Georgia courts have held on numerous occasions that an eighth-grade education is sufficient to allow an adolescent to understand and waive his *Miranda* rights.[13] *Murray*, 276 Ga. at 397 (2) (at the time of his custodial statement, defendant "was enrolled in the ninth grade in school"); *Marshall*, 248 Ga. at 229 (3) (2) (defendant was in the eighth grade of a school for emotionally disturbed children); *In the Interest of C. H.*, 306 Ga. App. at 836 (2) (defendant "had an eighth grade education and could read and write"); *Stone*, 271 Ga. App. at 750 (2) (defendant "had completed the eighth grade"). The majority, however, implies that despite his age and education, Boyd should be treated in

---

[12] As the majority acknowledges, it does not address several of the nine factors identified by the Supreme Court in *Riley*, 237 Ga. at 128, because it does not think every factor is critical to its finding that Boyd's waiver of his rights was not voluntary and knowing. The factors not directly addressed by the majority include the length of the interview, the fact that Boyd was interviewed before charges were filed, the fact that Boyd had never refused previously to give a statement to the police about this incident, and the fact that Boyd has never repudiated his confession. Under our case law, however, the length of the interview in this case (25-30 minutes) supports the finding that Boyd's waiver was voluntary. See *Murray*, 276 Ga. at 397 (2) (interview of juvenile lasted only 36 minutes); *In the Interest of C. H.*, 306 Ga. App. at 835-836 (2) (affirming denial of motion to suppress confession of juvenile, noting that "questioning lasted less than one hour"); *Swain*, 285 Ga. App. at 552 (fact that juvenile was questioned for approximately two hours did not impact voluntary nature of statement to police); *Stone v. State*, 271 Ga. App. 748, 752 (7) (610 SE2d 684) (2005) (interview of juvenile lasting 27 minutes "is not coercive"). And the majority appears to concede that both the fact that Boyd never had previously refused to give a statement to the police and the fact that he never repudiated his confession support the denial of the motion to suppress.

[13] Although Boyd was in the ninth grade at the time of his arrest, that arrest occurred in September of his ninth-grade year. I therefore assume that Boyd had at least the equivalent of an eighth-grade education.

a different way than other 15-year-old, high-school freshman because he "could not tell the officer his street address or whether he lived in Norcross or Lilburn." Although Boyd could not give his precise address during the interview, he was able to identify the name of the apartment complex in which he lived and describe in some detail where that complex was located, indicating that Boyd, in fact, knew exactly where he lived and how to get there, even if he did not know the mailing address associated with that location. See *Stone*, 271 Ga. App. at 750 (2) (addressing the juvenile's eighth-grade education and noting that he "gave detailed narrative responses to the [interview] questions, not simple monosyllabic answers"). Moreover, Boyd was able to recite the telephone numbers for his parents and his social security number, which he had the presence of mind to volunteer to the investigator near the end of the interview.

But in any event, the question is not whether Boyd is as smart as most 15-year-olds. The question instead is whether, given the totality of the circumstances, the evidence supports the conclusion of the court below that Boyd was intelligent enough to understand the things about which he was being interviewed and his constitutional rights and to make an informed decision to waive those rights. See *Stone*, 271 Ga. App. at 750-751 (2) (upholding trial court's finding that 15-year-old defendant made a knowing and intelligent waiver of his rights despite expert testimony that he had an IQ of 89, "the mental age of a twelve-year-old, a fourth-grade reading comprehension level, and a verbal comprehension level of a nine-year-old"). I see nothing in the record to indicate that Boyd was not capable of understanding these things, and I do not have the opportunity, as did the court below, to observe Boyd in person. I do not think we can find that the trial court clearly erred when it found that Boyd made a knowing and voluntary waiver of his rights.

The record also supports the conclusion that Boyd understood the basis of the charges against him as well as his right to consult an attorney and his right to remain silent. The robbery occurred only a few hours before Boyd was interviewed, and no one disputes that Boyd understood that the investigator wanted to discuss the robbery. Boyd never claimed at the hearing that he did not understand why the police were questioning him or that he believed the police had an interest in anything other than the robbery. Thus, although there was no testimony that Boyd was told specifically he was facing charges of armed robbery, and although he may not have understood the precise legal implications of his conduct, the evidence was sufficient to support the conclusion that Boyd understood at least the general nature of the charges he might face. The majority points to Boyd's belief that the gun was unloaded and infers that he might have

believed this circumstance would mitigate his crime, but even if he did, every teenager reasonably ought to understand, I think, that any crime involving a firearm is, relatively speaking, a serious matter.

Moreover, the recording of the interview shows that Boyd was informed of his rights to remain silent and consult with a lawyer, he acknowledged he understood those rights, and he agreed to waive them. This evidence supports the trial court's finding that Boyd's waiver was knowing and intelligent. See *Murray*, 276 Ga. at 397 (2) (affirming denial of motion to suppress where it was established at the motion to suppress hearing that the juvenile suspect was informed of his rights and acknowledged that he understood them); *Stone*, 271 Ga. App. at 751 (3) (police informed juvenile suspect of his *Miranda* rights, including the right to remain silent and to consult with an attorney, and juvenile subsequently executed a written waiver of those rights). The majority implies that Boyd might not have understood his rights because they "were unnecessarily read [to him] in a way that might have confused an adult, much less a 15-year-old being interviewed at 2:30 a.m." I disagree. As the taped interview shows, the investigator told Boyd, "I am going to read you *your* rights" and the investigator then explained that he would be reading those rights to Boyd as if Boyd was reading those rights to himself. I fail to see how Boyd could reasonably believe, particularly in light of the officer's explanation to him, that the investigator was saying that the investigator, rather than Boyd, had a right to remain silent and to consult a lawyer.

Furthermore, the majority's analysis of this issue is seriously undercut by the evidence presented at the motion to suppress hearing. The recording of the interview reveals that, at no time during or after the reading of rights to Boyd, did he express any confusion or ask any questions about those rights. Indeed, when asked if he understood his rights, Boyd nodded his head in the affirmative. Additionally, as noted earlier, the investigator testified that Boyd appeared to understand everything he was being told during the interview, and Boyd himself testified that he did not invoke his right to remain silent only because of the threat that the investigator allegedly made, a threat that, the court below properly found, never was made in fact. That testimony, standing alone, indicates that Boyd understood that he had the right to remain silent, but chose not to invoke that right.

It is also clear from the record that Boyd was not held incommunicado and denied access to his parents or to a lawyer. Rather, the record shows that Boyd never asked to speak with an attorney, with either of his parents, or with any other trusted adult. And, as the majority acknowledges, our Supreme Court has declined to adopt a per se rule either that a parent must be present or that a juvenile

must be asked specifically if he wishes to talk with a parent, before being interviewed by police officers. See *Murray*, 276 Ga. at 398 (3) ("we have consistently held that the custodial statement of a juvenile is not rendered inadmissible merely because it was made in the absence of a parent"); *Killings v. State*, 296 Ga. App. 869, 872 (2) (676 SE2d 31) (2009) (even though juvenile had given police contact information for his mother, the fact that he "was interviewed outside the presence of his mother, although a factor to be considered by the trial court, did not preclude the admission of his statement"); *Dickerson v. State*, 292 Ga. App. 775, 776 (1) (666 SE2d 43) (2008) (physical precedent only) (noting that the juvenile code does not require "a parent to be present during questioning" of a minor arrested for or suspected of a crime). Given that Boyd never asked to speak with a parent or anyone else, I believe it is patently unreasonable to suggest either that Boyd was held incommunicado or that the police otherwise acted inappropriately. *Murray*, 276 Ga. at 397 (2) (juvenile not held incommunicado where he "did not ask to speak with his parents nor was he denied access to a telephone or prevented in any way from contacting family members"); *Stone*, 271 Ga. App. at 751 (4) (juvenile not held incommunicado where "[d]uring the interview, [he] made no request to see or speak with any relatives, friends, or an attorney").

The majority also finds that the methods used in the interview are problematic, mostly because the investigator first encouraged Boyd to "straighten out what in the hell happened this evening" and then asked Boyd if he "wanted to get it straightened out now," all without having informed Boyd of the precise charges he faced. The officer's use of the term "straightened out," the majority reasons, could have caused a juvenile, unaware of the serious nature of the charges he was facing, to believe that there would be no repercussions if he simply explained to the police what had happened.[14] Again, I disagree with this analysis.

---

[14] Although not addressed directly in its legal analysis, the majority also appears to be bothered by the fact that Boyd was handcuffed and placed in the interview room by himself, the interview occurred at approximately 2:30 a.m., and that Boyd was not offered anything to drink either before or during the interview. The tape of the interview does show that Boyd was initially placed in the interview room in handcuffs, and he was left there by himself for approximately 12 minutes. When the investigator entered the room to interview Boyd, however, he immediately removed his handcuffs, a fact that the majority fails to acknowledge. And although the interview did occur during what many of us would consider the middle of the night, I doubt that 2:30 a.m. is an especially late hour for many teenagers. In any event, Boyd was not roused from his bed to be interviewed. More importantly, although no one disputes that Boyd was a little tired, he appears to be alert and responsive during the interview. Finally, while Boyd was not offered anything to drink prior to or during the 24-minute interview, there is no evidence that he asked for anything to drink — or anything else — during that time. Given these facts, I do not think that any of these circumstances support the conclusion of the majority that

Our cases make clear that police officers encouraging a suspect to talk, urging them to tell the truth, and informing them that not talking or lying will only make things worse, without more, "does not constitute hope of benefit so as to render involuntary any statement made thereafter." *In Interest of J. L.*, 229 Ga. App. 447, 450 (2) (494 SE2d 274) (1997), citing *Henry v. State*, 265 Ga. 732, 736 (4) (c) (462 SE2d 737) (1995) (punctuation omitted). See also *Stone*, 271 Ga. App. at 752 (6) ("[t]he police's insistence that [a juvenile suspect] tell the truth was appropriate" method of interrogation); *Owens v. State*, 209 Ga. App. 272, 273 (433 SE2d 382) (1993) (the hope of a benefit "which originates in the mind of the person making the confession and which originates from seeds of his own planting," rather than from the words of the police, does not render a confession involuntary) (citation and punctuation omitted). And as I mentioned earlier, even though the officer did not inform Boyd explicitly that he was facing charges of armed robbery, Boyd clearly was aware of the incident that precipitated the interview. Notably, the majority acknowledges that the interrogation methods used here are permissible, at least for adults. It then concludes, however, that these methods are "ill-advised when interviewing a juvenile." Whether certain police inter-rogation tactics are ill-advised, however, is not the question with which we are presented. Our job is not to grade the police. The only question with which we are presented is whether such tactics render involuntary an otherwise voluntary and knowing waiver of constitu-tional rights. And although the majority finds that the tactics used here suggest that Boyd's waiver was not knowing and voluntary, it cites no legal authority to support this conclusion. In light of the legal authority that does exist, however, I cannot agree with the majority's conclusion that the interview tactics were so unreasonable that they rendered Boyd's waiver of his rights invalid. See, e.g., *Swain*, 285 Ga. App. at 552-553 (affirming denial of motion to suppress juvenile's confession even though the interviewing detective "used some pro-fanities during the interview, called [defendant] a liar and a coward, and told [defendant] some lies regarding other evidence that they had against him," where the detective did not threaten the defendant or promise him a benefit, and the defendant "failed to cite to any authority to support his argument that the methods the detective used were improper or otherwise required the exclusion of" his confession).

Boyd's waiver of his rights was neither knowing nor voluntary. See *Swain*, 285 Ga. App. at 552 (noting that juvenile defendant "did not ask for food, water, or a break during the interview, which lasted approximately two hours").

For all these reasons, and based upon a consideration of the totality of the circumstances, including the nine *Riley* factors, under a proper standard of appellate review, we ought to affirm the denial of the motion to suppress. Because the majority does not, I respectfully dissent.

DECIDED MARCH 28, 2012.

*G. Richard Stepp*, for appellant.
*Daniel J. Porter, District Attorney, David K. Keeton, Assistant District Attorney*, for appellee.